[No. B113311. Second Dist., Div. Three. Jan. 29, 1999.]

VANCE JACKSON, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Diane Marchant for Plaintiff and Appellant.

James K. Hahn, City Attorney, Frederick N. Merkin and S. David Hotchkiss, Assistant City Attorneys, for Defendants and Respondents.

## OPINION

**CROSKEY, J.**—The appellant, Vance Jackson, a Los Angeles police officer, asks us to reverse the judgment of the trial court which rejected his petition for administrative mandamus brought under Code of Civil Procedure section 1094.5 to set aside a disciplinary suspension imposed upon him by the chief of police of the respondent City of Los Angeles (City). Because we conclude that the administrative proceedings conducted by the police department with respect to the charges brought against Jackson were lawful and fully authorized by the Los Angeles City Charter, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In January of 1995, Jackson, who had then been a police officer for about seven years, testified at a police department board of rights hearing of a complaint filed against three other officers. These officers, who were off duty at the time, had been charged with misconduct in connection with their failure to control a crime scene where a shooting had occurred and to identify themselves to the on-duty police officers who had responded to the scene.

The three officers and Jackson all had worked as off-duty security at the Mayan Club near 11th and Hill Streets in downtown Los Angeles. Their duties involved crowd control and parking lot security. On May 20, 1993, about 1:30 a.m. in the morning there was a shooting inside the club. The suspected shooter had been taken into custody at one point but had been released at the scene by either the off-duty officers or private security guards. It was 10 months before the suspect was finally arrested.[2]

As a result of the internal investigation which followed, the three other off-duty officers were charged with misconduct, but not Jackson. At their board of rights hearing, held on January 17 and 19, 1995 (about 20 months after the incident), Jackson gave testimony about his own conduct on the

---

[1]Our summary of the facts is based upon the administrative record (which was subjected to independent review by the trial court), and which we review in the light most favorable to the judgment. Jackson does *not* contend that there is no substantial evidence in the record to support the judgment.

[2]This circumstance caused no small amount of embarrassment to the police department and was doubtless one of the reasons for the internal investigation which followed.

night of May 20, 1993, which was not true. For example, he testified that he was not near the club at the time of the shooting and did not know that it had occurred. He testified that he had been "at the corner" talking to an old high school friend, one Michael Glaze. His testimony, as a result, was not very useful; moreover, it was false.[3] However, it did make an impression on the senior police officers who sat on the board. They found him so incredible as to question his fitness to be a police officer. They believed that he had been lying and referred their conclusion to Jackson's commanding officer for appropriate action.

An internal investigation was initiated which concluded that Jackson had given false testimony at the hearing. Jackson's commanding officer reviewed the investigation report and concluded that Jackson had indeed lied. However, based on Jackson's prior performance as a police officer,[4] he recommended that a five-day suspension was adequate punishment. A complaint verified by the chief of police containing two counts of misconduct was filed with the police commission on January 16, 1996: "Count 1. On or about January 17, 1995, you, while on duty, gave false and misleading testimony during a Board of Rights. [¶] Count 2. On or about January 19, 1995, you, while on duty, gave false and misleading testimony during a Board of Rights."

Based on that complaint, the chief imposed the recommended five-day suspension. We have this matter before us because Jackson (acting on the advice of his defense representative) decided to appeal that suspension to a board of rights. This, he had a right to do under section 202 of the city charter. On or about January 17, 1996, Jackson and his representative went to Parker Center, selected the members of the board[5] and selected March 4, 1996 for its convening. On January 19, 1996, the hearing date was changed to March 26, 1996, apparently due to a scheduling conflict among the selected board members. That date was later continued to May 28, 1996, at Jackson's request.[6]

A few days prior to that date, Jackson and his representative discussed the possibility of abandoning his appeal after they were able to look at the

---

[3]For example, Glaze, who was later contacted by investigating officers, denied Jackson's testimony about seeing and speaking with him on the night of May 20, 1993.

[4]The record reflects that Jackson's personnel file contained several commendations and very good rating reports. His only prior discipline had been for a preventable traffic accident.

[5]The record reflects that on January 19, 1996, Jackson certified the three members of the board which he had selected two days earlier (a Commander Kalish and a Captain Williams as the command members and a Mr. Roger Coggan as the civilian member).

[6]Such request was apparently made after Jackson obtained a new defense representative who required additional time to prepare for the hearing.

evidence of Jackson's false statements which was developed by the department's internal investigation.[7] Alternatively, they also discussed the need for further investigation. It was finally decided that his representative would ask for a continuance of the hearing and, if that was denied, then the appeal would be withdrawn, he would plead guilty and accept the five-day suspension.

When the board convened on the morning of May 28, Jackson was not present. Apparently believing he would not be needed, he was handling some personal matters. However, the board denied the motion to continue and then refused to accept Jackson's motion (made through his representative) to withdraw the appeal, plead guilty and accept the five-day suspension. The board, in addition, was not happy that Jackson had not appeared. The board expressed the view that it had been convened, the hearing had commenced and Jackson had no right to unilaterally terminate it. Jackson's representative was directed to locate Jackson and have him appear for the hearing at 1:00 p.m. that afternoon. The matter was then continued to that time.

When the board reconvened, Jackson was present. He explained the personal reasons for his absence in the morning and apologized. His rights were read into the record and the administrative charges were again read. The appellant was asked to enter a plea: "[Commander Kalish]: How do you plead on count 1? [¶] The Accused: Guilty. . . . [¶] [Commander Kalish]: How do you plead on count 2? [¶] The Accused: Guilty."

Thereafter, the parties entered into a stipulation that the matter would be submitted to the board based on the department's investigation, including a photo lineup and the statement of Michael Glaze, the high school friend whom Jackson had testified he had been talking to at the time of the May 1993 shooting at the Mayan Club. As already noted, Glaze's statement, obtained by police investigators after Jackson had requested a board of rights hearing, directly contradicted Jackson's 1995 testimony. The board also heard testimony from two other officers and Jackson. After reviewing all the testimony and exhibits presented, the board deliberated and unanimously found Jackson guilty of counts 1 and 2.

The board then took up the issue of the proper disciplinary penalty to be imposed. It heard testimony from two witnesses, one of whom was then Jackson's supervisor. It reviewed his record with the department and it

[7]Specifically, they had learned that police investigators had located Michael Glaze in prison and obtained a statement from him contradicting Jackson's prior sworn testimony at the January 1995 board of rights hearing.

allowed Jackson to speak on the issue. It then retired to deliberate. It returned after an extended period of time and announced that it had reached a decision, but that it was not unanimous. Two of the members voted to impose a 129-day suspension. The minority view, held by the senior board member (Commander Kalish), was that Jackson should be dismissed from the police department.

The majority decision, which was delivered by one of the board members, accurately summarizes the evidence reflected by the administrative record; and Jackson does not contend that it does not substantially support the board's decision or the determination of the trial court. We therefore quote from it at some length:

"Captain Williams: The conduct involved in this case concerns us greatly. We see a very clear pattern of lies starting from your initial investigative interview through and including the Board of Rights, this Board of Rights.

"You lied to complaint investigators; you lied to the prior Board of Rights; and you lied to us.

"We believe you have severely damaged your integrity and destroyed your credibility. In determining the penalty, we examined your work history, prior personnel complaints and the misconduct you've admitted to and have been found guilty of.

"Your personnel file indicated approximately seven years of excellent service, with several commendations for outstanding work. Your prior complaint history is void of any issues involving a lack of integrity. We found one sustained complaint involving a preventable traffic collision in 1994.

"The character witnesses testified that they would be glad to continue to work with you and felt you are a valuable asset to the Department.

"One character witness, however, Lieutenant George Gascon, the officer in charge of your section, testified that if he had knowledge at the time of the adjudication of your personnel complaint that there was clear evidence of a pattern of false testimony, that he would have considered a more severe penalty, because it was an indication that you didn't learn from past mistakes. . . .

"We believe that the lies you told on the dates in question were not just oversights, or any lack of preparation or any inability to clearly articulate your feelings or knowledge.

"We believe your testimony regarding relevant issues were from a conscious mind. In other words, we believe by virtue of your own testimony that you purposely lied under oath with at least the intent to hide your own culpability.

"As to the May 20th, 1993, incident, as to the charges and as to the charges against you today, you admitted you lied under oath on January 17 and January 19, 1995, when you told the Board of Rights that you did not know what had happened at the Mayan Club until a black-and-white unit and paramedics showed up.

"You admit that you knew all along that there had been a shooting but failed to take appropriate action. You admitted you lied when you said you didn't identify yourself because you were pushed away by responding officers. You admitted that you didn't I.D. yourself to the officers because you didn't want to get involved. You admitted you lied under oath on January 17 and 19 so that you would not be charged with the same acts of misconduct your fellow officers were charged with.

"Your testimony yesterday, May 28th, 1996, is further evidence of a pattern of deceit. You testified falsely in your own Board of Rights involving charges of false and misleading statements at a Board of Rights.

"You told us yesterday that you lied to the previous Board, January 17 and 19, because you were embarrassed because you were a block away from the club talking to a friend and not really doing your job. But under further testimony and questioning by the Board, you admitted you lied again. You admitted the real reason for lying on January 17 and 19 was that you were not far from the club and actually knew what was going on, but didn't want to get involved. In essence, you even lied to this Board of Rights.

"All of these lies seriously damage your credibility, integrity and character. We now find it difficult to believe anything you tell us in your own defense. This could very well seriously damage your value to the Department.

"Although we discussed your lies involving your statements to the investigators and your culpability regarding the May 20th, [19]93, incident, we don't base our recommendation of penalty on those issues.

"Our recommended penalty is based solely on the charges before us today and the testimony that we have heard, mainly your testimony.

"It is our experience in these matters that this type of misconduct is egregious and deserves very severe sanctions. Negative discipline has a

threefold purpose: To change behavior of the accused, to maintain public confidence in the system and to send a message to all employees. The majority hopes that this recommended penalty fulfills all three purposes.

"Mr. Coggan will now read the remainder for the majority opinion."

"Mr. Coggan: This Board deliberated many hours as to whether the appropriate penalty should be six months or termination.

"Yet, we speak with one voice in our statement of the facts. Our only difference is what is the proper penalty to attach to the agreed upon facts.

"It is our understanding that the original recommended penalty was for far less than six months or termination. However, the original adjudicator of the facts who testified before this Board did not have clear and admitted evidence of false and misleading statements.

"This Board of Rights was the first adjudicator which had before it such a pattern of conduct.

"During the course of this hearing, this Board has heard evidence in the form of your testimony, which was not known to the Department prior to this Board of Rights. This testimonial evidence goes directly to the degree of misconduct involved in this case.

"We all have concerns as to whether you understand the seriousness of lying under oath, both at the previous Board of Rights hearing and at this hearing. There was little at this hearing which allays those concerns.

"The majority recommendation of this Board would have been termination were it not for your history with the Department, as well as our conclusion that your lies appear to be self-serving as opposed to helping or harming other officers or civilians.

"The majority of this Board recommends that you be suspended for 129 days."

This recommendation was adopted by the chief of police. Jackson thereafter filed a petition for a writ of mandamus pursuant to Code of Civil Procedure section 1094.5. After conducting an independent review of the record, the trial court concluded that the weight of the evidence supported the findings and conclusion of board of rights and the decision of the chief of police in accepting its recommendation. The court also held that the disciplinary punishment imposed was proper and did not amount to an abuse of discretion. Jackson then prosecuted this timely appeal.

## CONTENTIONS

As already noted, Jackson does not raise any issue about the substantiality of the evidence. He argues instead that the actions of the board of rights were in excess of its jurisdiction. He supports that argument with three contentions: (1) the board did not timely convene as required by the city charter; (2) the board improperly refused to permit Jackson to withdraw or abandon his appeal and improperly forced him to proceed to his very substantial detriment; and (3) the board improperly compelled Jackson to appear at the board's hearing upon threat of additional charges.

The City disputes each of these arguments and urges us to affirm the trial court's judgment.

## DISCUSSION

▮▮▮ The critical issue raised by this appeal is whether a City police officer, who has elected to appeal a disciplinary suspension pursuant to section 202 of the Los Angeles City Charter, may thereafter abandon the appeal and thus deprive the board of rights of any jurisdiction over the determination of the disciplinary punishment of the officer which is the subject of the appeal. There is no case law which is of direct assistance in this matter. We therefore must attempt to develop an answer from an examination of the relevant provisions of section 202 which purport to establish and regulate such proceedings, and from case law which has developed with respect to that section and the procedural process which it has established.

Los Angeles City Charter section 202(1) provides: "The rights of a tenured officer of the Police Department, except the Chief of Police, to hold his or her office or position and to the compensation attached to such office or position is hereby declared to be a substantial property right of which he or she shall not be deprived arbitrarily or summarily, nor otherwise than as herein in this section provided. No tenured officer of the Department shall be suspended, demoted in rank, suspended and demoted in rank, removed, or otherwise separated from the service of the Department (other than by resignation), except for good and sufficient cause shown upon a finding of 'guilty' of the specific charge or charges assigned as cause or causes therefor after a full, fair, and impartial hearing before a Board of Rights, except as otherwise specifically provided in Subsections (3) and (8). No case of suspension with loss of pay shall be for a period exceeding six months."

Los Angeles City Charter section 202(3) provides in relevant part:

"After following pre-disciplinary procedures otherwise required by law, the Chief of Police may:

"(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(b) Suspend such officer for a total period not to exceed thirty days with loss of pay and with or without reprimand, *subject, however, to the right of such officer to a hearing before a Board of Rights.* In the event the officer suspended under this paragraph files his or her application with the Chief of Police (within five days after service upon him or her of notice of such suspension if he or she has been personally served or within ten days after service in any other manner as herein prescribed), for a hearing before and decision by a Board of Rights in the manner in this section provided, *such suspension shall thereupon automatically be stayed pending hearing and decision by the Board.* In the event, however, that such officer so suspended fails so to apply for such hearing within the period prescribed, the officer shall be deemed to have waived such hearing, and such suspension shall remain effective, *unless the Chief of Police required that a hearing be had, as hereinafter provided;* . . ." (Italics added.)

Los Angeles City Charter section 202(5) provides: "In the event any order of relief from duty, suspension, demotion in rank, or suspension and demotion in rank is made under Subsection (3), such order shall contain a statement of the charges assigned as causes therefor, and the Chief of Police shall within five days after such order is served, as in this section prescribed, file with the Board of Police Commissioners a copy of a verified written complaint upon which such order is based, with a statement that a copy of such order and verified complaint was served upon the accused. Such complaint shall be verified by the oath of the Chief and shall contain a statement in clear and concise language of all the facts constituting the charge or charges made."

Los Angeles City Charter section 202(7) provides: "Within five days after service upon him or her of a copy of the complaint, as described in Subsection (5) if the officer has been personally served or within ten days after service in any other manner provided for herein, the officer may file with the Chief of Police his or her written application for a hearing before and decision by a Board of Rights."

Los Angeles City Charter section 202(8) provides in relevant part: "*In any case where a Board of Rights has been constituted* for the purpose of hearing as herein in this section provided and the accused, without reasonable excuse, fails, neglects, or refuses to appear before such Board in session for

such hearing at the time and place designated, *the Chief of Police may, at his or her discretion, either direct the Board to proceed with such hearing in the absence of the accused, or the Chief may, without such hearing, impose such penalty of suspension, demotion in rank, suspension and demotion in rank, or removal as he or she deems fit and proper*, and cause notice thereof to be served upon such officer in the manner herein prescribed, and file a statement of such action with the Board of Police Commissioners within five days thereafter; . . ." (Italics added.)

Los Angeles City Charter section 202(9) provides: "Upon the selection of a Board of Rights, the Chief of Police shall appoint the time for (not less than ten nor more than thirty days thereafter) and designate a place where such hearing is to be held, and shall cause notice thereof to be served upon the accused in the manner herein prescribed. *After it has first convened, the Board may at any stage of the proceedings continue the matter to a specific date, and no other notice need be given, except as may be required by order of the Board.*" (Italics added.)

Los Angeles City Charter section 202(13) describes the procedural rules applicable to the conduct of a board of rights hearing. Subdivision (e) of section 202(13) provides: "A Board of Rights shall at the conclusion of the hearing make specific findings of 'guilty' or 'not guilty' on each specific charge, which findings shall be based only upon the evidence adduced before it at such hearing and render and certify its decision in writing. If the accused is found 'not guilty,' the Board shall order the officer's restoration to duty without loss of pay and without prejudice, and such order shall be self-executing and immediately effective. In case, however, that the accused is found 'guilty,' the Board of Rights shall prescribe its penalty by written order of either suspension for a definite period not exceeding six months with total loss of pay, and with or without reprimand; or demotion in rank, with or without suspension or reprimand or both; or reprimand without further penalty; or of removal, which decision and order must be certified in writing and a copy thereof immediately delivered to the Chief of Police."

Los Angeles City Charter section 202(14) provides in relevant part: "Upon delivery of a certified copy of a decision and order of a Board of Rights to the Chief of Police, he or she shall within five days after such delivery either execute such order or the Chief may at his or her discretion and in lieu of such order, impose a penalty upon such officer less in severity than that ordered by the Board, but may not impose a greater penalty. . . ." (Italics added.)

It can readily be seen that none of these provisions deals directly with the question of whether a police officer, having initiated the board of rights

process in order to appeal a particular disciplinary action, may later decide to accept the initial punishment and unilaterally abandon that process so as to preclude any further valid action by the board. However, these provisions, when read in their entirety, do strongly suggest that the disciplined officer has no such right. It is settled that the provisions of Los Angeles City Charter section 202 represent a comprehensive scheme designed to govern the discipline of police officers. (*Holcomb* v. *City of Los Angeles* (1989) 210 Cal.App.3d 1560, 1564 [259 Cal.Rptr. 1].)

■ The appeal process provided for in Los Angeles City Charter section 202 satisfies the requirements of the Public Safety Officers Procedural Bill of Rights (Gov. Code, § 3300 et seq.) which provides that no "punitive action" may be taken against an officer "without providing the public safety officer with an opportunity for administrative appeal." (Gov. Code, § 3304, subd. (b).) The purpose of this statutory provision is to offer to a disciplined officer "an avenue to challenge a disciplinary decision which could result in disadvantage, harm, loss or hardship." (*Holcomb* v. *City of Los Angeles*, *supra*, 210 Cal.App.3d at p. 1566; *White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 683 [183 Cal.Rptr. 520, 646 P.2d 191].) This purpose is served by ensuring that the officer has an opportunity to convince his or her employer to reverse the initial disciplinary decision by either demonstrating the falsity of the charges or through the presentation of mitigating circumstances. (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 140 [185 Cal.Rptr. 232, 649 P.2d 874].) Thus, at least upon superficial consideration, it might seem inconsistent with the clear purpose of the procedural bill of rights for a disciplined officer to be allowed to utilize this mandated appellate process *only* at the risk of an increase in the initial punitive action.

This exact question was raised in the case of *Holcomb* v. *City of Los Angeles*, *supra*, 210 Cal.App.3d 1560. There, a Los Angeles police officer was accused by a superior of insubordinate conduct in failing to return promptly to the stationhouse when ordered to do so. The officer's supervisor (who had issued the disobeyed order) filed a complaint and an investigation was conducted. As a result of that investigation, the charges were sustained and a five-day suspension was recommended. The chief of police reviewed the matter and approved the suspension. The officer exercised his right to seek a hearing before a board of rights. After that hearing was concluded, the officer was found guilty and the punishment awarded was a 15-day suspension, a threefold increase over the initial disciplinary action. The chief accepted and imposed this penalty. The officer filed a petition for a writ of mandate.

Arguing that the board's increase in his penalty effectively penalized him for exercising his right to appeal, he contended that the board's action

violated Government Code section 3304, subdivision (a) which provides in relevant part: "No public safety officer shall be subjected to punitive action, or denied promotion, or be threatened with any such treatment, because of the lawful exercise of rights granted under this chapter, or the exercise of any rights under any existing administrative grievance procedure."

The trial court agreed with this argument, granted the requested writ relief and ordered that the original penalty be reinstated. The City appealed and the Court of Appeal reversed. It did so, however, not because an increase in the original penalty, in and of itself, was not a violation of Government Code section 3304, subdivision (a), but rather because the record reflected that the board had considered additional evidence which had not been considered when the original penalty had been imposed. In addition, the board also had the opportunity to review his entire personnel file and to question him about his job performance and "attitude." Thus, the court held, the officer had failed to establish, and the record did not support, the conclusion of the trial court that the 15-day suspension was prompted by the exercise of the officer's right to an appeal "as opposed to the *particular facts of the case.*" (*Holcomb* v. *City of Los Angeles, supra*, 210 Cal.App.3d at pp. 1567-1568, italics added.)

The court expressed its reasoning and conclusion in words which are fully applicable here: "Holcomb has cited no decisional authority or legislative history to support his claim the enactment of Government Code section 3304, subdivision (a) was intended to destroy the powers granted by the city charter to the Board. Sound policy considerations and common sense preclude adoption of such a position given the actual contours of the hearing granted to him by the city charter. That is, while Holcomb's request for a Board hearing is the pragmatic equivalent of an administrative appeal of the chief of police's prior decision, *it is not an appeal in the traditional mode whereby the reviewing tribunal is limited to canvassing the evidence already adduced and is bound by earlier factual determinations. Instead, the Board hearing is a de novo adversarial proceeding.* In light of this circumstance, the city charter provision permitting the Board, if it finds the officer 'guilty' of the charge(s), to recommend a potentially larger punishment is logical. Having had an opportunity to determine each witness's credibility, to examine evidence, and to review and discuss with the officer his personnel file, the Board is best suited to determine the appropriate sanction within the limitations set forth by the city charter. [¶] In order to harmonize Government Code section 3304, subdivision (a) with these procedures, we therefore construe it to mean merely that the Board may not arbitrarily increase a punishment to retaliate against an officer for seeking a hearing. However, '[i]t is presumed that official duty has been regularly performed.' (Evid.

Code, § 664.) This rebuttable presumption affects the burden of proof (Evid. Code, § 660) and effectuates the policy of relieving governmental officials from having to justify their conduct whenever it is called into question. [Citation.] Hence, if an officer believes the Board imposed a greater punishment as a vindictive measure, it is the officer's burden to establish that fact as '[t]he effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.' (Evid. Code, § 606.) At bench, the only evidence cited by Holcomb in that regard is that the Board recommended 15 days' suspension. As already explained, the record contains more than ample legitimate reasons for that decision. Holcomb has failed to carry his burden of proving by a preponderance of the evidence the nonexistence of the presumed fact. [Citation.]" (*Holcomb* v. *City of Los Angeles, supra,* 210 Cal.App.3d at p. 1568, italics added.)

We have the same factual pattern here. The board had before it additional and more detailed evidence of Jackson's failure to speak truthfully than had been available at the time of the recommendation for the initial five-day suspension; indeed, the board members all concluded that Jackson had even given false testimony before them. In addition, they had his entire personnel file to review and its mitigation impact, at least upon the board's majority, is what prevented a recommendation of dismissal. The record supports no other conclusion than that the board made its decision based upon the record which was presented to it.

■ While Jackson has not directly made the same argument as the disciplined officer in *Holcomb,* he does argue that he had the *right* to abandon his appeal to the board of rights and thus prevent the imposition of the harsher penalty. We disagree. When read as a whole, particularly in light of the decision in *Holcomb,* it seems clear that once initiated, the board of rights process becomes the sole forum by which the discipline issue is to be resolved. Under Los Angeles City Charter section 202(3)(b), once Jackson's appeal of the chief's initial decision was made, the original suspension was "automatically stayed *pending hearing and decision by the Board.*" (Italics added.) Under section 202(8), *once the board was constituted,* Jackson was required to appear before the board; his failure to do so could result in the chief either directing the board to proceed or the chief, without further hearing, imposing such penalty as he saw fit. This strongly implies that a different or increased penalty could be imposed. In other words, once the board was constituted, Jackson's disciplinary exposure was taken entirely out of his hands. Here, the board had been constituted as required by section 202(10) weeks before Jackson ever moved to withdraw his appeal. Indeed, the board had actually convened and had commenced the hearing and had denied a continuance motion before the issue was even raised.

Jackson has cited us to no authority, nor has he provided any persuasive argument, supporting his contention that he had a right to terminate the board of rights proceeding after the board had both been "constituted" and had in fact "convened" on the scheduled date. Our reading of Los Angeles City Charter section 202, as a whole, persuades us that the rule should be otherwise. Whether or not a disciplined officer has a right to abandon his appeal at some earlier stage, once a board has been constituted and in fact has convened, the officer has no right to terminate the proceedings by withdrawing or abandoning his appeal.[8]

With respect to the other two issues raised by Jackson, i.e., that the board (1) did not timely convene for hearing, and (2) improperly compelled Jackson to appear at the hearing, we summarily reject them. First, there is nothing in the record to demonstrate that the board did not timely convene after it had been constituted by the filing of Jackson's hearing request and his selection of the board members. The original hearing date of March 4, 1996, was continued to March 26 for administrative reasons and Jackson made no objection thereto; indeed, he himself requested a second and much longer continuance due to his change of defense representative. Thus, he has effectively waived the issue and, in any event, was not prejudiced thereby.

As to Jackson's second contention, that he was improperly compelled to testify, there is a simple response. He had no right to refuse. Orders to appear issued by his superior officers could be disobeyed only at the risk of further disciplinary action. Moreover, Los Angeles City Charter section 202(11) specifically provides that board members may "compel the attendance of witnesses and production of evidence by subpoena." Moreover, while it is true that the board ordered Jackson's appearance upon pain of further charges, no such charges were in fact filed and the board could have proceeded to the same result in Jackson's absence. He therefore suffered no prejudice as a result of his appearance; and he can hardly blame the board for the adverse consequences which flowed from his giving false testimony at the hearing. His "compelled" attendance at the hearing did not *cause* his false testimony. That was his own idea.

Finally, although he does not contend that the 129-day suspension was an inappropriate penalty, Jackson argues that he was denied a neutral forum or a fair hearing. His principal contention, given the "in-house" nature of the

---

[8]Indeed, Los Angeles City Charter section 202(10) strongly suggests that the officer never really has any final say in the matter. That subsection specifically provides that in the event the officer fails to even request a hearing, the chief still has the right to do so. This provision clearly negates the existence of any "right" a disciplined officer has to control these proceedings.

board membership, is that he was entitled to competent advice about his rights to "abandon" his appeal. The statements allegedly made to him by one of his representatives to the effect that he could do so until the board convened and the first witness was called were erroneous. But, as we have noted, Jackson never had any absolute right to control this process in any event. As a result, such advice, even if given and relied upon by Jackson to delay his withdrawal request for a few days, made no difference.

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

Klein, P. J., and Kitching, J., concurred.