[No. D055494. Fourth Dist., Div. One. Apr. 22, 2010.]

CHRISTOPHER ARTHUR, Plaintiff and Appellant, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Respondent.

1200

COUNSEL

Paul H. Neuharth, Jr., for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Alicia M. B. Fowler, Assistant Attorney General, Chris A. Knudsen and Terry R. Price, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**McCONNELL, P. J.**—Christopher Arthur appeals a judgment denying his petition for a writ of mandate to set aside the Department of Motor Vehicles (DMV) suspension of his driver's license for driving with a blood-alcohol content of 0.08 percent or greater. (Veh. Code, § 13353.2, subd. (a)(1).)[1] Arthur challenges the sufficiency of the evidence to support the trial court's finding that the sobriety checkpoint at issue was in substantial compliance with the factors set forth in *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321 [241 Cal.Rptr. 42, 743 P.2d 1299] (*Ingersoll*), and was thus constitutional. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 6, 2007, Officer Benjamin McCurry of the San Diego Police Department (SDPD) was one of several officers assigned to staff a sobriety checkpoint located in the 4300 block of West Mission Bay Drive in San

---

[1] Future undesignated statutory references are also to the Vehicle Code unless otherwise specified.

Diego. The checkpoint began operating at 9:00 p.m., and was terminated on July 7 at approximately 2:27 a.m. Around 1:00 a.m., Arthur drove his car into the checkpoint lanes, which were identified by traffic cones. Before reaching the officers, Arthur, who had been drinking, tried to turn out of the checkpoint lanes to avoid the checkpoint.

Officer McCurry observed Arthur's maneuver and intercepted him. Arthur agreed to take a field sobriety test, which he failed. He exhibited alcoholic breath, bloodshot and watery eyes, slurred speech and dilated pupils. Officer McCurry arrested Arthur for driving under the influence of alcohol, and a blood test taken later revealed his blood-alcohol content was 0.08 percent. Arthur was served with an order for the suspension of his driver's license within 30 days. (§ 13353.2.)[2]

Arthur requested an administrative hearing before the DMV, and it was held on three dates between September 2007 and May 2008. The continuances were necessary so Arthur could obtain documents from the SDPD pertaining to the sobriety checkpoint. He argued the checkpoint violated the guidelines the California Supreme Court set forth in *Ingersoll, supra,* 43 Cal.3d 1321, and thus it was unconstitutional and could not support the suspension of his driver's license.

Arthur testified that when he saw cones in the road, vehicles backed up, and officers present, he assumed he was entering a sobriety checkpoint. He denied seeing any advance notice that he was entering a checkpoint. He denied any knowledge of wrongdoing by attempting to avoid the checkpoint. He admitted consuming alcohol before his arrest.

Officer McCurry testified he was the "contact officer" for the sobriety checkpoint, meaning "I was . . . on the driver's side in the cone pattern." He explained: "The cone pattern starts down the roadway to funnel the vehicles in. And then on the [c]heckpoint there is . . . a big stop sign that they put out and then that's where they . . . start actually contacting the drivers." Officer McCurry also testified there were signs at the beginning of the cone pattern notifying drivers of the sobriety checkpoint. Once a car passed the signs and entered the coned lanes, it could not exit the checkpoint area without proceeding to where officers were located.

Arthur's counsel asked Officer McCurry, "Who made the determination for the setting up of the roadblock? Who established the site, who made a determination there was going to be a [s]obriety [c]heckpoint there?" Officer

---

[2] Section 13353.2, subdivision (a)(1) provides that the DMV shall immediately suspend a person's privilege to operate a vehicle if the person "was driving a motor vehicle when the person had 0.08 percent or more, by weight, of alcohol in his or her blood."

McCurry responded: "Our Traffic Division handles that. I volunteered to work it but I don't set it up." He did not know who supervised the sobriety checkpoint or whether a mathematical formula was used to determine which vehicles to stop.

The SDPD produced a document titled "Media Advisory" (some capitalization omitted), which stated there would be a sobriety checkpoint on Friday, July 6, 2007, beginning at 9:00 p.m., in the 1300 block of West Mission Bay Drive. It also stated that for more information, the SDPD's Traffic Division could be contacted. A similar notice dated a few days earlier stated the location of the checkpoint was to be announced. Three diagrams of West Mission Bay Drive indicated that a sobriety checkpoint scheduled for *June* 6, 2007, was to be held in the vicinity of the 900 to 1300 block. The SDPD also produced an internal e-mail that states seven officers manned the sobriety checkpoint on July 6 and 7. A document titled "Number of Vehicles Stopped, Sobriety Tests Given and D.U.I. Arrests" (some capitalization omitted), indicates that 519 vehicles drove through the checkpoint and each of them was stopped.

At the conclusion of the hearing, Arthur argued the checkpoint was unconstitutional under the *Ingersoll* guidelines, since it was located in the 4300 block of West Mission Bay Drive rather than the 1300 block of West Mission Bay Drive as announced in the media advisory. After taking the matter under submission, the hearing officer rejected Arthur's argument and reimposed the suspension of his driving privilege.

Arthur then filed a petition for writ of mandate in the superior court, seeking an order requiring the DMV to vacate and set aside the order suspending his driving privilege. After an evidentiary hearing, the court denied the petition. The court determined the sobriety checkpoint was in "substantial compliance" with the *Ingersoll* factors, and was thus constitutional. Judgment was entered on June 10, 2009.

### DISCUSSION

### I

#### *Standard of Review*

■ When a person petitions for a writ of mandate following an order suspending his or her driver's license, the court is required to determine, based on the exercise of its independent judgment, whether the weight of the evidence supports the administrative decision. (*Lake v. Reed* (1997) 16 Cal.4th 448, 456 [65 Cal.Rptr.2d 860, 940 P.2d 311]; Code Civ. Proc., § 1094.5.) In

making that determination, the court acts as a trier of fact; it has the power and responsibility to weigh the evidence and make its own determination about the credibility of witnesses. (*Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658 [53 Cal.Rptr.2d 4].) The administrative findings, however, are entitled to "a strong presumption of correctness," and "the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693].)

On appeal, we review the record to determine whether the court's findings are supported by substantial evidence. " ' "We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.] We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings. [Citation.]" ' " (*Lake v. Reed, supra,* 16 Cal.4th at p. 457.)

II

Ingersoll *Factors*

A

In *Ingersoll,* the court held that "within certain limitations," sobriety checkpoints may be operated without violating the Fourth Amendment to the federal Constitution or article I, section 13, of the state Constitution. (*Ingersoll, supra,* 43 Cal.3d at p. 1325.) In *Ingersoll,* the court rejected the argument that the validity of sobriety checkpoints should be analyzed under the standard set forth in *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 957, 582 P.2d 957], "requiring an individualized suspicion of wrongdoing." (*Ingersoll, supra,* at p. 1327.) The *Ingersoll* court explained the primary purpose of a sobriety checkpoint is not to detect evidence of crime or arrest drunk drivers, but to "promote public safety by deterring intoxicated persons from driving on the public streets and highways." (*Id.* at p. 1328.) The court concluded the validity of sobriety checkpoints "is to be determined not by the standard pertinent to traditional criminal investigative stops, but rather by the standard applicable to investigative detentions and inspections conducted as part of a regulatory scheme in furtherance of an administrative purpose." (*Ibid.*)

After analyzing decisions pertaining to various types of seizures that did not require reasonable suspicion, the *Ingersoll* court held that "stops and

inspections for regulatory purposes may be permitted if undertaken pursuant to predetermined specified neutral criteria." (*Ingersoll, supra*, 43 Cal.3d at p. 1335.) The court assessed the constitutionality of a sobriety checkpoint by "weighing the gravity of the governmental interest or public concern served and the degree to which the program advances that concern against the intrusiveness of the interference with individual liberty." (*Id.* at p. 1338.) The court explained that "[d]eterring drunk driving and identifying and removing drunk drivers from the roadways undeniably serves a highly important governmental interest" (*ibid.*), and there is evidence sobriety checkpoints "do advance this important public goal" (*id.* at p. 1339).

■ As the court explained in *Roelfsema v. Department of Motor Vehicles* (1995) 41 Cal.App.4th 871 [48 Cal.Rptr.2d 817] (*Roelfsema*): "In examining the intrusiveness of such checkpoints, the *Ingersoll* court identified eight factors to 'provide functional guidelines for minimizing the intrusiveness of the sobriety checkpoint stop.' [Citation.] These factors are: (1) decisionmaking at the supervisory level; (2) limits on discretion of field officers as to who is to be stopped; (3) maintenance of safety conditions; (4) reasonable location of the checkpoint; (5) a reasonable time and duration of the checkpoint; (6) indicia of the official nature of the roadblock; (7) the length and nature of the detention; and (8) advance publicity regarding each checkpoint. [Citation.]" (*Id.* at p. 876.) "The eight factors identified in *Ingersoll* provide 'functional guidelines' to assess the intrusiveness of a checkpoint.' " (*Id.* at p. 877.)

At the administrative hearing, the DMV was required to prove by a preponderance of the evidence that Arthur had driven a vehicle while under the influence of drugs or alcohol, the officer lawfully arrested Arthur, and he had driven with a blood-alcohol content of 0.08 percent or higher. (§ 13557, subd. (b)(2); *Lake v. Reed, supra*, 16 Cal.4th at pp. 455–456.)

■ Under Evidence Code section 664,[3] "it is presumed the checkpoint was operated consistent with *Ingersoll*. The official duty—setting up and operating the sobriety checkpoint—is presumed to have been regularly performed. [Citation.] Once the presumption attaches, it is then up to the licensee to attack the propriety of the checkpoint. She [or he] must show there was 'some irregularity' in the sobriety checkpoint operation. [Citation.]

---

[3] Evidence Code section 664 provides in part: "It is presumed that official duty has been regularly performed." The rebuttable presumption under Evidence Code section 664 "effectuates the policy of relieving governmental officials from having to justify their conduct whenever it is called into question." (*Jackson v. City of Los Angeles* (1999) 69 Cal.App.4th 769, 782 [81 Cal.Rptr.2d 814].)

Until she [or he] does so, the constitutionality of the checkpoint is not at issue." (*Roelfsema, supra*, 41 Cal.App.4th at p. 880.)[4]

B

Arthur contends the sobriety checkpoint was unconstitutional because it failed to comply with three of the eight *Ingersoll* factors. We conclude the contention lacks merit.

■ First, Arthur asserts the DMV presented no evidence of decisionmaking at the supervisory level. The "decision to establish a sobriety checkpoint, the selection of the site and the procedures for the checkpoint operation should be made and established by supervisory law enforcement personnel, and not by an officer in the field. This requirement is important to reduce the potential for arbitrary and capricious enforcement." (*Ingersoll, supra*, 43 Cal.3d at pp. 1341–1342.)

Given the presumption under Evidence Code section 664, however, it was Arthur's burden to adduce evidence the sobriety checkpoint did not comport with the *Ingersoll* factors. The presumption attached once the DMV submitted Officer McCurry's written report and testimony regarding his duties as a contact officer at the sobriety checkpoint.

Arthur merely speculates the checkpoint lacked supervisory decisionmaking because it was operated in the 4300 block of West Mission Bay Drive, a different location than the Media Advisory gave. The trial court could reasonably find the discrepancy insufficient to overcome the presumption. Documentary evidence shows the SDPD Traffic Division planned a sobriety checkpoint for July 6–7, 2007, and it was manned by seven police officers, factors that indicate supervisory control rather than a decision by patrol officers in the field. Further, Officer McCurry's testimony confirmed that the Traffic Division sets up sobriety checkpoints.

■ Second, Arthur asserts the sobriety checkpoint failed to comply with *Ingersoll* because the DMV presented no evidence of a neutral, mathematical selection process for stopping vehicles. In *Ingersoll*, the court explained "that motorists should not be subject to the unbridled discretion of the officer in the

---

[4] The *Roelfsema* court explained: "We doubt that the Legislature intended to require the DMV to prove the constitutionality of each and every sobriety checkpoint, at every license revocation hearing, regardless of whether the issue had been raised." (*Roelfsema, supra*, 41 Cal.App.4th at p. 879.) The *Roelfsema* court also explained that Evidence Code section 664 "does not permit a presumption that [an] *arrest* was lawful. Once the existence of the checkpoint is shown, the DMV still must show there were grounds [for an] arrest . . . ." (*Roelfsema, supra*, at p. 880.)

field as to who is to be stopped. Instead, a neutral formula *such as every driver* or every third, fifth or tenth driver should be employed." (*Ingersoll, supra,* 43 Cal.3d at p. 1342, italics added.)

Again, the burden was on Arthur to overcome the Evidence Code section 664 presumption of compliance with *Ingersoll.* Arthur cites Officer McCurry's testimony he was unaware of any such formula applied at the checkpoint, but that is not affirmative evidence overcoming the presumption. Further, an SDPD document titled "Number of Vehicles *Stopped,* Sobriety Tests Given and D.U.I. Arrests" (some capitalization omitted, italics added), indicates that all 519 vehicles passing through the checkpoint were stopped. Thus, a neutral mathematical formula of 100 percent applied, and officers exercised no individual discretion. Officer McCurry's lack of knowledge on the particular point is unavailing. Arthur adduced no evidence that fewer than 519 vehicles were stopped.

■ Third, Arthur argues the sobriety checkpoint violated *Ingersoll* because it was not conducted at a reasonable location, again relying on the discrepancy between the media advisory location and the actual location. *Ingersoll* explains that the "sites chosen should be those which will be most effective in achieving the governmental interest; i.e., on roads having a high incidence of alcohol related accidents and/or arrests. [Citation.] Safety factors must also be considered in choosing an appropriate location." (*Ingersoll, supra,* 43 Cal.3d at p. 1343.) Arthur points to no evidence suggesting the location was inappropriate per se. Rather, it appears he is actually arguing the change in location deprived him of advance notice.

■ The *Ingersoll* court explained that "[a]dvance publicity is important to the maintenance of a constitutionally permissible sobriety checkpoint. Publicity both reduces the intrusiveness of the stop and increases the deterrent effect of the roadblock. [¶] . . . [¶] Publicity also serves to establish the legitimacy of sobriety checkpoints in the minds of motorists." (*Ingersoll, supra,* 43 Cal.3d at p. 1346.) It is established, however, that the absence of a single *Ingersoll* factor, "such as the failure to provide advance publicity, does not necessarily mean the checkpoint is unconstitutional." (*Roelfsema, supra,* 41 Cal.App.4th at p. 877; see *People v. Banks* (1993) 6 Cal.4th 926, 949 [25 Cal.Rptr.2d 524, 863 P.2d 769].) In *People v. Banks,* the California Supreme Court held that in light of United States Supreme Court precedent, *Michigan Dept. of State Police v. Sitz* (1990) 496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481], and "consistent with the weight of authority," the "operation of a sobriety checkpoint conducted in the absence of advance publicity, but otherwise in conformance with the guidelines we established in *Ingersoll* . . . , does not result in an unreasonable seizure within the meaning of the Fourth Amendment to the United States Constitution." (*People v. Banks,* at pp. 948–949.)

Arthur does not contest that the DMV satisfied its burden of proving Arthur had driven a vehicle while under the influence of drugs or alcohol, the officer lawfully arrested Arthur, and he had driven with a blood-alcohol content of 0.08 percent or higher. Contrary to Arthur's position, he did not satisfy his burden of overcoming the Evidence Code section 664 presumption as to the sobriety checkpoint's compliance with the *Ingersoll* factors, and thus the burden of proof never shifted to the DMV on those issues. Substantial evidence supports the judgment.[5] .

## DISPOSITION

The judgment is affirmed. The DMV is entitled to costs on appeal.

Benke, J., and Aaron, J., concurred.

---

[5] In his reply brief, Arthur argues he showed an irregularity in the sobriety checkpoint by showing "he was unlawfully pulled over when he attempted to access the far right lane of the checkpoint lanes, which no cones were blocking access to." He asserts, "This is important because under *Ingersoll* the opportunity to avoid a sobriety checkpoint is necessary to help minimize the intrusiveness of a sobriety checkpoint." Arthur waived appellate review of any issue pertaining to his effort to avoid the checkpoint by not raising it in his opening brief. (*California Recreation Industries v. Kierstead* (1988) 199 Cal.App.3d 203, 205, fn. 1 [244 Cal.Rptr. 632].)